THEODORE CREVELING, Appellant, v. M. T. BANTA ET AL. THEODORE CREVELING, Appellant, v. M. T. BANTA ET AL. ALEXANDER CREVELING, Appellant, v. M. T. BANTA ET AL. ALEXANDER CREVELING, Appellant, v. M. T. BANTA ET AL.

**Deeds:** CONDITIONAL DELIVERY: FRAUDULENT POSSESSION AND USE.
1 Where deeds were executed with the consideration and name of grantee left blank and given to a person to deposit in a bank, where they were to remain until other land was conveyed by such person to the grantors, and the deeds were not deposited but used by such person for his own benefit there was no delivery to the person with whom they were intrusted which would pass title, as his possession and use were wrongful.

**Same.** It is only where it was intended that a conveyance should
2 take effect from the fact of delivery without any further act of the grantor that oral evidence is admissible to show nondelivery; the rule has no application where the instrument was given to the grantee to hold in escrow until the doing of some act on his part.

**Deeds:** DELIVERY: INTENT OF GRANTOR. Delivery of a deed is com-
3 plete only where the grantor has put it beyond his power to recall or reclaim it, with intent that it shall operate as a conveyance; and the issue is one of fact, to be ascertained from the acts and circumstances indicating a present intent to place the instrument under the control of the grantee.

**Same:** PAROL PROOF OF DELIVERY. The question of whether there was a complete delivery of the deed to the grantee in no manner goes to the terms of the contract, so that as between the grantor and grantee named therein parol evidence is admissible on the question of delivery; but parol evidence of nondelivery to the original grantee is not admissible as against an innocent purchaser from him for value, who relied upon his apparent ownership; since as between two parties, both of whom have been wronged, the one least in fault will be protected.

**Delivery of deed with consideration and grantee left blank.** Actual delivery of a deed with the consideration and name of grantee left blank carries with it implied authority to fill or cause the blanks to be filled.

**Same:** *Bona fide* PURCHASER: NOTICE OF FRAUD: EVIDENCE. Evidence examined and held to show that one dealing with the possessor of deeds had notice, after a certain date, that the same had been obtained by fraud.

**Contracts:** FRAUD: RESCISSION. Ordinarily one may not retain what he has received on a contract and rescind the same, but it is not necessary that the restoration be in kind where that has been rendered impossible by the act of the other party in carrying out a fraudulent purpose; in such circumstances the party making rescission is not required to sacrifice all that he has received to put the other party in *status quo;* as where defendant fraudulently procured conveyances to plaintiff's land and in return conveyed to plaintiff only a portion of other lands as agreed, the plaintiff should not be required to reconvey the land received and accept in its stead a worthless judgment.

*Appeal from Decatur District Court.*— HON. H. M. TOWNER, Judge.

THURSDAY, MARCH 19, 1908.

THE above causes were heard together, and a decree entered in the first two, by the terms of which judgment was entered in favor of Theodore Creveling against Banta in the sum of $1,744.41, with interest from September 4, 1904, and this established a lien superior to the claims of defendants on one hundred and ninety acres of land in dispute. A decree was entered in the last two cases in favor

of Alexander Creveling and against Banta for $429.14, with interest from September 15, 1904, and a lien, therefore, established superior to the claims of defendants on the one hundred and twenty acres of land in controversy. The plaintiffs appeal.— *Reversed* and *remanded.*

*Marion F. Stookey* and *B. M. Russell,* for appellants.

*V. R. McGinnis* and *C. W. Hoffman,* for appellees.

LADD, C. J.— The contracts were entered into September 21, 1898, one between Theodore Creveling and wife and M. T. Banta, who also signed the Equitable Land Company as agent, and the other between Alexander Creveling and the same parties. In that of Theodore Creveling, Banta and the company agreed to convey one thousand seven hundred and sixty acres of land in Rawlins county, Kan., to Creveling, and pay $2,000 difference for four hundred and eighty-nine and three-fourths acres in Decatur county, Iowa. At that time neither the company nor Banta owned or had any interest in any of the Kansas land described in the contract. Indeed the record has convinced us that no such company was in existence, and that Banta was making use of the name as an aid in effectuating his fraudulent enterprise. Knowing these conditions, Banta induced Creveling and wife, who were not advised of them, to convey to different parties to whom Banta had bargained the same two hundred and ninety-nine and one-half acres of the Decatur county land, and received therefor $6,500 net. Creveling still retained (1) the W. ½ N. E. ¼ section 1, township 67, range 27, and the S. W. ¼ S. E. ¼ section 36, township 68, range 27; (2) the S. ½ N. E. ¼ section 2, township 67, range 27; and (3) 10 acres in the N. W. ¼ S. E. ¼ of the same section. To induce them to sign the deeds to these tracts and move to Kansas, Banta represented to Creveling and wife that the deeds to one thousand four hundred and forty acres

of the land there, three hundred and twenty acres having been conveyed to Mrs. Creveling, were in Rawlins County Bank ready for them upon their arrival. Banta well knew the deeds were not there, and he never procured title to such land as agreed. Three deeds to the above-described lands, however, were signed, with the consideration and name of the grantee left blank, and handed to Banta April 10, 1899. Creveling denied in the most positive manner that he even authorized Banta or any one else to fill the blanks or cancel the revenue stamps, but does testify that he signed the deeds with blanks, as stated, and handed them to Banta, under an agreement that they were to be deposited with the Commercial Bank at Lamoni, Iowa, after being signed by his wife, to be left there until conveyances of the Kansas land were delivered; that he acknowledged them before the notary over the telephone. Mrs. Creveling testified that in procuring her signature to the instruments Banta agreed that the deeds should be left at the bank until the delivery of the conveyances of the Kansas land, and he would make no claim to them till then. This was on the eve of their departure to Kansas, and evidently was a ruse played by Banta to get the remainder of their land. Of course Banta denied that such was the arrangement, but the record stamps him as utterly unreliable, and, according to the Crevelings, when advised that the blanks had been filled and the deeds recorded, he expressed surprise, and charged Nicholson, the cashier of the bank, with doing this without authority. The notary testified that the deeds were signed and acknowledged before him at the bank, with authority to Banta or any one he might direct to fill in the blanks. But Banta confirms the story of the Crevelings that the instruments were not signed at the bank and were handed to him in the absence of the notary. The latter states no particulars in his deposition, and evidently was indulging in conclusions.

We are inclined to accept the Crevelings' version of this transaction. They were about to depart, and might well

have thought to facilitate closing the deal by leaving these

**1. DEEDS:** instruments at the bank in an incomplete con-
**conditional** dition pending the delivery of the conveyances
**delivery:**
**fraudulent** which Banta represented were ready for them
**possession**
**and use.** at Atwood, Kan. As between them and Banta
then there was no delivery, for (1) possession of the
deeds was obtained by fraud (*Patton v. Cook,* 83
Iowa, 71, and *Golden v. Hardesty,* 93 Iowa, 622); and (2)
the deeds in an incomplete condition were handed to Banta
to be deposited in the Commercial Bank, to be held by it
until the deeds to the one thousand four hundred and forty
acres of land in Kansas were delivered to Creveling.

Of course, if there had been a delivery of these deeds
to a grantee named therein, or even to a person authorized
to insert the name of the grantee, there might be ground for

**2. SAME.** the contention that title immediately passed
(*McGee v. Allison,* 94 Iowa, 533), as also
would there be had there been a delivery to Banta to hold in
escrow; for the authorities are agreed that, where the instru-
ment is given to the grantee to hold in escrow and to take
effect upon the happening of an event, oral evidence of this
condition is not admissible (*Miller v. Fletcher,* 27 Grat.
(Va.) 403 (21 Am. Rep. 356); *Baker v. Baker,* 159 Ill.
394 (42 N. E. 867); 1 Warvelle on Vendors, section 506).
But this rule is said to apply to cases only where it is in-
tended that the conveyance shall ultimately take effect from
the force of such delivery without further act upon the part
of the grantor. *Brackett v. Barney,* 28 N. Y. 344; *Hicks
v. Good,* 12 Leigh (Va.) 479 (37 Am. Dec. 677); *Wend-
linger v. Smith,* 75 Va. 309 (40 Am. Rep. 727).

But before these questions can arise there must have
been a delivery. The issue as to whether an instrument has

**3. DEEDS:** been delivered is one of fact, and primarily
**delivery:** dependent on the intention of the grantor.
**intent of**
**grantor.** The delivery is complete only when the grantor
has put the instrument beyond his power to revoke or re-

claim, with the intent that it shall operate as a conveyance. This intent is to be inferred from the acts or circumstances, but these must be such as to indicate a present intent to place the deed under the control of the grantee. There may be a handing over of the instrument into the manual possession of the grantee without any delivery; and, on the other hand, there may be a delivery, though the instrument remain in the control of the grantor. *Babbitt v. Bennett,* 68 Minn. 260 (71 N. W. 22).

It is not a question as to whether conditions were attached to a delivery, but as to whether there was a delivery at all; and surely the objection that oral evidence is not admissible on this issue because tending to contradict an instrument in writing is not pertinent, for the inquiry is not as to the terms of the contract, but whether it has become obligatory. In *Sutton v. Weber,* 127 Iowa, 361, after reviewing the authorities, this court observed that " there is a clear distinction between oral testimony to vary terms of a written contract and parol testimony to show that the writing never had legal inception as a contract." In *Pyn v. Campbell,* 6 El. & Bl. 370, the parties signed an agreement with the understanding that it should not take effect until approved by another, and, as the latter had not approved, oral evidence to so indicate was held admissible to show the condition on the theory that it did not tend to vary the terms of a written agreement, but to prove that there was no agreement at all. The distinction is clearly drawn in *Gilbert v. Insurance Co.,* 23 Wend. (N. Y.) 43 (35 Am. Rep. 543):

4. SAME:
   parol proof
   of delivery.

If he (grantor) deliver it as his deed to the grantee, it will operate immediately, and without any reference to the performance of the condition, although such a result may be contrary to the express stipulation of the parties at the time of the delivery. This is one of the cases in which the law fails to give effect to the honest intention of the parties, for the reason that they have not adopted the proper legal means

of accomplishing their object. But this case does not come within the rule. There was no delivery of the deed, either upon condition or otherwise, to the grantee. The agreement of the parties was, in substance, that the deed should be placed in the hands of Mr. Babcock until the controversy with White should be settled, and then, and not before, the conveyances should be delivered. . . . If Babcock had been present, and the conveyances had been handed to him at that time, there would have been no question about it. And although absent, if the deed had been sent to him with the proper instructions by the hand of a third person, it could not be maintained that this would amount to a delivery to the grantee. Now, what was done in this case? The deed as well as the mortgage was left in the hands of Nottingham to be forwarded to Babcock, the depositary. It was not put into the hands of the grantee to keep, but merely as a mode of transmission to Babcock, as was well said by the judge on the trial. There was neither any formal delivery nor any intent that the grantee should take it as the deed of the grantor. Nottingham received it, not as grantee, but as the agent of the grantor for a special purpose; and I see no good reason why he could not execute that trust as well as a stranger.

As between Creveling and Banta this case is exactly in point, and the reasoning unanswerable. *Jackson v. Sheldon,* 22 Me. 569; *Murry v. Stair,* 2 B. & C. 82; *Cherry v. Herring,* 83 Ala. 458 (3 South. 667). As said in *Fairbanks v. Metcalf,* 8 Mass. 230, the deed while in the hands of the grantee, under these circumstances, " should be considered as *in transitu* " and the grantee " as merely the instrument or agent " of the grantor to deliver it to the third person. The distinction is noted in Tiedeman on Real Property section 815: " If the delivery be to the grantee for the purpose of having it delivered immediately to a third party to hold as an escrow, the delivery to the grantee will not vest a title in him; the intent with which it was done controlling its effect." As well preclude proof that possession of the conveyance has been acquired by the grantee through the practice of fraud or by duress or accident as to exclude evidence

that his possession of it is because of a breach of trust reposed in him as agent of the grantor. As between the parties to the transaction parol evidence of what was done was admissible. *Benton v. Martin,* 52 N. Y. 570.

It must be borne in mind that a deed or conveyance of land is no longer an instrument under seal, and this being so, save for the protection of titles, there is no reason for applying a different rule with respect to these than to other instruments in writing. There must be a delivery to become effective as between the parties to the instrument, and this does not happen when such is not the intention of either party. Plainly enough when Banta received these deeds with the agreement to deposit them with the bank in escrow, and they were left with him for that purpose, there was no intention that this should constitute a delivery to him. The rather must he be held to have taken them as agent, and his breach of trust in their retention cannot alone be held to confer on him the rights of grantee. As between Banta and the Crevelings we have no trouble in determining that there was neither a delivery of the deeds in blank nor express authority to fill in the blanks. But the authority to do so upon the delivery of the conveyances in Kansas is clearly to be implied. They were to remain in escrow until the happening of that event, and then, though not so said in as many words, to be turned over to Banta, as is manifest from the circumstances of the transaction. In other words, the grantors placed these instruments in Banta's possession, and thereby armed him with the means of deceiving those with whom he might deal in reliance on his apparent ownership of the land. As against innocent purchasers for value Creveling cannot be heard to complain of the conditions under which he acquired the deed, for as between two parties, both of whom have been wronged, the one least at fault will be protected. On this ground, and to guard titles, parol evidence is not admissible against third persons dealing with the land, for value and without notice, to prove conditions on which

the intended grantee acquired possession of the deed. Were the rule otherwise, an avenue for the overthrow of titles in the names of innocent purchasers by parol evidence would be furnished, which would jeopardize the value and defeat the purpose of the recording acts. See *Braman v. Bingham,* 26 N. Y. 483.

True the deed was in blank, but the rule seems to be settled in this State that the delivery of such instruments carries the implied authority to insert or cause to be inserted the name of grantee and the consideration.

5. DELIVERY OF DEEDS WITH CONSIDERATION AND GRANTEE LEFT BLANK.

See *Devin v. Himer,* 29 Iowa, 297; *Owen v. Perry,* 25 Iowa, 412; *Clark v. Allen,* 34 Iowa, 190; *Swartz v. Ballou,* 47 Iowa, 188; *McClain v. McClain,* 52 Iowa, 272. What was evidently feared by Dillon, J., in *Simms v. Hervey,* 19 Iowa, 273, 297, if this rule were adopted has transpired, and deeds or mortgages to land are now "floated" almost as readily as commercial paper, and the name of the grantee inserted when it finds an owner who concluding to retain the land elects to insert his name as grantee. The practice, while not conserving a single laudable purpose, has proven an efficient help in the perpetration of fraud and the concealment of property from the pursuit of creditors. In view of the previous decisions of this court, however, we are constrained to hold that as to innocent purchasers the deeds passed the legal title to the grantees, whose names were inserted in the blank deeds.

II. Banta, instead of doing as he agreed, went to D. F. Nicholson, cashier of the Commercial Bank, and negotiated a loan on these deeds. Undoubtedly he represented that he had authority to fill in the blanks, and directed

6. SAME: *bona fide* purchaser: notice of fraud: evidence.

Nicholson to do so. This was April 11, 1899. While Nicholson must have understood something of Banta's character, the evidence is not sufficient to charge him with notice of the fraud practiced by Banta prior to August 2, 1899, even though

he might well have suspicioned prior thereto that Banta might be diverting some of the proceeds of the land received to purposes other than fulfilling his agreements with the Crevelings. On February 25, 1899, he loaned Banta $25, and again $366.65 on March 21st. Three days later there was another loan of $1,000. March 27, 1899, he loaned him $425. On April 11, 1899, Banta borrowed $125 at one time, and $1,200 at another, and at the same time deposited with Nicholson the deeds referred to and those of Alexander Creveling which will be mentioned later, as security for the payment of the last-named amount, with written authority to sell the lands and apply the proceeds on the debt, if not paid when due, " or any further indebtedness which may be due or to become due by me to the said bank." On April 24th Banta borrowed $500, and four days later $20 more. On May 5th another loan of $2,830 was made, and out of it the $1,000 note, the $366.65 note, and the $20 note were satisfied. May 5, 1899, another contract such as set out in part was executed. June 21st he loaned him $25. These were all the loans made, save an advancement hereafter mentioned, as this banker also was a farm loan broker.

Banta introduced H. A. Tapscott to Nicholson on April 8th, and advised him that he proposed to obtain a loan of $3,000 on the S. W. ¼ S. E. ¼ of section 36, township 68, range 27, and the W. ½ N. E. ¼ of section 1, township 67, range 27. Tapscott's name was inserted in the deed. He executed the mortgage, and then made a deed with grantee's name blank, and handed it back to Nicholson. The proceeds were used to cancel the existing mortgage on the land of $1,553.73 and other incidental expenses, including a $60 commission to Nicholson and in satisfaction of the $1,200 note, and $136.78 was indorsed on the $2,830 note. One thousand two hundred and eighty-nine dollars and fifteen cents procured from an independent loan was applied to this note. Banta paid Tapscott $15 for this kindness. Another loan of

$4,000 was made March 1, 1900, on the remaining ninety acres as above described belonging to Theodore Creveling and forty acres owned by Alexander Creveling. G. W. Lewton performed the same kindly service in this transaction as did Tapscott in the other. Of this sum $1,472.16 was applied on an existing incumbrance on the portion of the land conveyed by Theodore Creveling. It is unnecessary to trace these transactions with reference to this loan farther, for, as will be seen, it was executed some time after this action was begun, and, unless the conveyances now to be considered be upheld, it must be canceled. On the 20th of September, 1899, Nicholson inserted his name in the conveyances back to him, and then executed a deed of the E. $\frac{1}{2}$ N. E. $\frac{1}{4}$ of section 1, township 67, range 27 (belonging to Alexander Creveling), to C. E. Creveling, subject to a mortgage of $2,000 and a second mortgage of $100 charging the purchaser $50 for selling the land to him, and on the same day a deed of the W. $\frac{1}{2}$ N. E. $\frac{1}{4}$ of section 1, township 67, range 27, and the S. W. $\frac{1}{4}$ S. E. $\frac{1}{4}$ of section 36, township 28, range 27, to A. M. Creveling, subject to a first mortgage of $3,000 and a second mortgage of $150.

These second or commission mortgages as well as other charges throughout the record bear evidence of Nicholson's thrift, though, in the absence of sufficient evidence of notice, it must be said that he cannot be held to have done anything beyond his right prior to August 2, 1899. On that day he met A. M. Creveling and wife, who had been out to Rawlins county, Kan., at St. Joe, Mo. Nicholson admitted that they advised him where they had been, and testified: "On the train the conversation led to how they liked the country out there, and I inquired how Theodore and Alex. liked it, and if they were satisfied to stay there. I did not ask her if Banta had fixed up anything. I supposed that had been fixed. She turned loose on Banta, and said that he was a thief and a liar." And, after saying that he did not know of any claim, on the part of the Crevelings, added: "I think

that I heard that Banta hadn't settled for all the land; hadn't supplied them with all of the land. I think Mrs. Creveling told me that on the train. Q. When was that? A. In August, 1899." On this subject Creveling testified: " I had a conversation with Mr. Nicholson at St. Joe on the second day of August, 1899, the same day my wife came from St. Joe. Q. Did you have any conversation with Mr. Nicholson relative to Mr. Banta's contract and what he had done with Theodore and Alex. ? A. Yes, sir; he came and shook hands with me, and wanted to know how the boys liked it, whether Banta had got the land for them as he agreed. Q. What did you tell him? A. I told him he hadn't done anything he agreed to do scarcely; that he hadn't complied with his contract at all." Mrs. Creveling confirmed this by saying: " He asked me what Mr. Banta had done, and I told him he had not done anything to amount to anything. He did deed them two or three hundred acres, I don't know how much, but that he hadn't done according to his contract. I told him Banta had not given them the deeds to the balance of the land. I told him Banta had not done anything according to the contract." This in connection with what Nicholson knew of Banta and his transaction makes it clear that the so-called theft was understood by Nicholson, and justified the trial court in finding that from that time on he acted with notice of the fraudulent character of Banta's transactions with the Crevelings. Though he has not appealed from the finding of the trial court that he was charged with notice, it has been necessary, in view of the enlarged and different relief granted in this court, to revert to this phase of the case, and pass on this issue. The trial court also found that C. E. Creveling and A. M. Creveling took the land mentioned with notice; and, as neither of them have appealed, it will be unnecessary to review the evidence bearing thereon save to say that the finding has ample support in the record.

III. Alexander Creveling was owner of four hundred

and fifty-nine acres of land in Decatur county, and on the 18th day of August, 1898, entered into a contract with the Equitable Land Company and M. T. Banta to exchange the same, subject to an incumbrance of $8,000, with interest at $7\frac{1}{2}$ per cent. per annum after March 1, 1899, for one thousand two hundred acres of land in Rawlins county, Kan. What has previously been said of this alleged company need not be repeated. Neither it nor Banta owned or had contracted for any of the land they undertook to convey; and though, as will hereafter appear, Banta succeeded in getting the title from Creveling, not an acre of the one thousand two hundred acres promised has even been conveyed to Creveling, nor any conveyance thereof tendered. According to Banta, he entertained good intentions, but failed to execute them. He proposed to substitute other land, but with the evident purpose of evading his contract and putting Creveling off. It will serve no good purpose to review his excuses for nonperformance. It is enough that he neither purchased nor contracted for any land, even ostensibly, for Creveling, save one quarter section at the price of $1,200, on which he paid but $500, and never procured title. No interest therein passed to Creveling. As there was an utter failure to perform on Banta's part save the payment of the items hereinafter mentioned as an inducement for a deed, there was no obstacle to a rescission. Creveling, however, parted with his land. First he conveyed three hundred and thirty-nine acres to one Walcott on Banta's promise to discharge certain items of indebtedness. The validity of that conveyance is not involved in this suit. This left the N. E. $\frac{1}{4}$ S. E. $\frac{1}{4}$ of section 2, township 67, range 27, and the E. $\frac{1}{2}$ N. E. $\frac{1}{4}$ of section 1, in the same township. Creveling and wife signed a deed without the name or the consideration inserted to each of these tracts. These were made out in pursuance of an arrangement with Banta that they should be deposited in the Commercial Bank until he procured conveyances of the Kansas land. Creveling also testified that he had a like

understanding with Nicholson, the cashier of the bank, but the clear preponderance of the evidence is against him. We are satisfied that these deeds were put up as security for loans to Banta under practically the same conditions as those of Theodore Creveling; and, without reviewing the evidence, it is enough to say that the same rules are applicable thereto. Nicholson inserted H. A. Tapscott's name as grantee in the deed to the eighty acres, procured him to execute a mortgage thereon of $2,000, and then reconvey, leaving the name of the grantee blank, and subsequently inserted the name of C. E. Creveling therein to whom he sold the land. He also inserted his own name in the deed to the forty acres, afterwards conveyed it to Lewton, who executed a mortgage of $4,000 on this and the ninety acres of the Theodore Creveling land after the beginning of these actions as previously stated. The record discloses that the balance of account between Creveling and Banta is against Creveling. There was a first mortgage of $8,000 bearing date February 1, 1898, on his land, with interest at 6 per cent. per annum, and second mortgage securing an installment note of $910 payable in 14 semiannual installments of $65 each without interest. Under the contract Banta was to take the land, subject to a mortgage of $8,000, with interest at $7\frac{1}{2}$ per cent. after March 1, 1899. Had the exchange been consummated, Creveling ought to have been charged with the interest to that date and one installment and a sixth of another, and, in addition thereto, whatever the two mortgages from that time on exceeded the face of the first, with interest computed at $7\frac{1}{2}$ per cent. per annum. Creveling should not be charged with the money paid on the quarter section of land, as he neither acquired title nor interest therein. His possession was under a lease from the owner of the fee, and not the purchase of Banta. Aside from the above Banta paid out for Creveling on his note a judgment, taxes, insurance, and other items concerning which there is no dispute the sum of $1,267.50, which, added to about $355.84 paid by Banta

on interest and installments up to November 1, 1899, makes $1,623.34, to be allowed Banta.

IV.   From the statement of facts it is apparent that restoration of Banta to *statu quo* would put him back in the condition of impecuniosity in which he first approached the Crevelings.   He then had nothing, unless it was a tract of land in the Ozark Mountains, too high up to be levied on, and was no better off at the time of the trial.   But out of the moneys obtained for Theodore Creveling's land he did procure three hundred and twenty acres in Kansas to be conveyed to Mrs. Creveling, and threw in school certificates for eighty acres, because he had deceived them as to the value of this land.   For these he claims to have paid $3,180.   He also procured deed to four hundred and eighty acres constituting the Gilmore ranch at an expense of $1,950, which was to be in lieu of part of the cash difference he was to pay.   He negotiated for another quarter section, but did not get it, and in various items paid Creveling $596.59 in money.   For the two hundred and eighty-nine and three-fourths acres of Creveling's land sold Banta had received $6,500, so that he has received more than he has paid out, and there was no occasion for the tender of any money to put him in *statu quo*.   He pretended to have procured this land, however, for the purpose in part, at least, of executing his agreement, and Creveling had so received it.   Ordinarily one may not retain what he has received in performance of an agreement, and yet effect a rescission.   But the case is peculiar.   Banta, though he represented that he or the company owned the land, never did, and never acquired any.   The deeds were executed by owners directly to the Crevelings, and manifestly a tender of these conveyances to Banta would not restore him to the situation in which he was at the inception of this transaction. The return of the money would come nearer this, but a tender of this was unnecessary, as, in event of recission, after allowing all credits, there will be a balance due from Banta.

7. CONTRACTS: fraud: rescission.

Moreover, the evidence shows that Banta is insolvent, and it would be inequitable to require Creveling to convey Banta the Kansas land bought with the proceeds of his farms, and award him a worthless judgment in its stead. Creveling tendered the conveyance of the Kansas land in the pleadings, but it is said that in other respects he has placed it beyond his power to restore Banta to his original position. These are not pointed out, and we have discovered none from an examination of the record. It is not necessary to justify a rescission that restoration in kind be possible to the person electing to rescind, when this has been rendered impossible by the acts of the other party in carrying out a fraudulent enterprise. The complainant may demand the return of the money paid and the property in the possession of the adverse party, or its market value, if alienated. *Erickson v. Fisher,* 51 Minn. 300 (53 N. W. 638); *Hilton v. Thresher,* 8 S. D. 412 (66 N. W. 816); *Hopkins v. Snedaker,* 71 Ill. 449; 9 Cyc. 433, and cases collected; 24 Am. & Eng. Ency. of Law (2d. ed.) 623. See *Fagan v. Hook,* 134 Iowa, 381; *Hale v. Kobbert,* 109 Iowa, 128. " If, therefore, he (Banta) has so entangled himself in the meshes of his own knavish plot that the party defrauded cannot unloose him, the fault is his own, and the law only requires the injured party to restore what he has received, and, as far as he can, undo what has been done in the execution of the contract. This is all that the party defrauded can do, and all that honesty and fair dealing require of him. If this fail to extricate the wrongdoer from the position that he has assumed, it is in no sense the fault of his intended victim; and, upon the principles of eternal justice, whatever consequences may follow should rest on the head of the offender alone." *Hammon v. Pennock,* 61 N. Y. 145.

This case comes clearly within these rules. Banta owned no land in Kansas, and, in so far as the record discloses, was the agent for the sale of none. And yet he showed the Crevelings the lands in Rawlins county, Kan., described

in the contracts, as though he had the right to dispose of them. His design was not to exchange lands, but to defraud those with whom he pretended to deal of their lands. The making of the contracts was a part of this scheme. They must have been entered into without intention to procure the conveyance of the lands, for he had no knowledge of the price asked for them, or that they were for sale at prices he could pay. To farther promote his scheme he induced the Crevelings to move to Kansas by falsely representing that the deeds to the land there were ready for delivery, and the record leaves little doubt but that what he did after their arrival was for the purpose of lulling his victims into security rather than with the honest design of fulfilling his contracts. In view of all this chicanery, ought he be permitted to set up the inability of those whom he has defrauded to place him in *statu quo,* when the changed conditions have resulted solely from his own manipulations, or in wresting the property from them, and in effectuating his abominable enterprise? We think not. We discover no tenable ground for denying the plaintiffs the right to rescind and have the remnants of their property within reach restored to them. Of course there were some changes in incumbrances made by or under Banta, but these can be readily adjusted in an accounting. *Campbell v. Spears,* 120 Iowa, 670; *Clapp v. Greenlee,* 100 Iowa, 586; *Smith v. Bricker,* 86 Iowa, 285.

As to the case of Alexander Creveling, there was no performance on Banta's part, but he did advance money as hereinbefore explained. But the value of the land voluntarily conveyed, together with the incumbrances placed on that not disposed of, as will hereafter appear, exceed the amount advanced by Banta, so no tender was necessary by Alexander Creveling. While Theodore Creveling tendered the conveyance of the two tracts of Kansas land in his petition, this should not be exacted in the decree, save upon the payment by Banta of the amount found due from him to Creveling. As the Kansas land was paid from the proceeds

of Creveling's farm, it would be inequitable to require him to convey these tracts, and take judgment against an insolvent instead. The decree should permit Banta to pay the amount owing by him and take the conveyances, or, if he does not do so, to give Creveling the right to elect whether he will retain the land and credit the sums paid therefor, with interest on the amount owing by Banta, or convey the land to him. This will be equitable, and an adjustment such as will protect the rights of both parties.

V. It is apparent that the accounting between the Crevelings and Banta will not be controlling in the matter of adjusting the equities between them and Nicholson. The latter is not entitled to protection after August 2, 1899, and all conveyances thereafter, together with the mortgage of $4,000 executed after the actions were begun, should be canceled. Prior thereto he had loaned Banta money at different times in reliance on the land as security — $425 March 27, 1899; $500 April 4, 1899; $2,830 May 5, 1899. On this last note $40.23 was indorsed May 12, 1899, $1,289.15 May 10, 1899, $136.78 in April, and $96.55 May 24, 1899, and possibly more. These loans were made on the faith of both the deeds of Theodore and Alexander Creveling, and should be allowed Nicholson in the accounting. As between the Crevelings the amount should be apportioned between them according to the values of their respective tracts of land at the time the deeds were deposited as security by Banta. This is equitable, as it is based as nearly as may be on the extent of security afforded; for the amount of the then existing incumbrance against these particular tracts of land cannot be ascertained from this record. While the evidence is somewhat conflicting, it fairly appears that the one hundred and twenty acre tract belonging to Theodore Creveling was then worth $40 per acre, and the ninety acre tract $65 per acre; that the eighty acre tract of Alexander Creveling was worth $37.50 per acre, and the forty acres $65 per acre. The determination of the amount owing Nicholson and the

apportionment of the same is mere matter of computation. Aside from the items mentioned it appears that Nicholson paid out of the proceeds of the mortgage of March 1, 1900, $1,472.16 to satisfy the existing mortgage on the one hundred and twenty acres of land belonging to Theodore Creveling, and this amount, with interest at 6 per cent. per annum from the date of such payment, should be allowed him as against Theodore Creveling. It also appears that Nicholson advanced $1,137.75 to satisfy the mortgage of $8,000 against the land of Alexander Creveling, and this amount, with interest, should be allowed him, and established as a lien against the land of said Alexander now in controversy. On the other hand, Nicholson must account for the rents and profits from the time he acquired possession thereof down to the present time, the respective amounts thereof above interest on the mortgages thereon, and taxes to be applied annually in reduction of the above liens.

VI. As between Banta and Theodore Creveling, the former should be charged with $6,500 he received for the two hundred and ninety-nine and one-half acres title to which passed. On the one hundred and twenty acre tract he placed a first mortgage of $3,000 and a second one of $150, and out of the proceeds paid to satisfy an existing mortgage of $1,553.73, and he should be charged the difference or $1,-596.27. In addition to the above he should be debited with the portion of the loans made to him by Nicholson charged to the land of Theodore. He should be credited with the sum of $596.59 heretofore mentioned. On all items interest at the rate of 6 per cent. per annum should be computed from the several times of payment by either party and judgment entered for the balance found to be owing by Banta. If he shall pay Theodore Creveling the amount so found within ninety days from the time of entering decree, said Creveling and wife will convey to him the two tracts of land in Kansas; if he shall fail so to do, then the title thereto shall remain in the Crevelings, and on the above judgment will

be credited with the amount paid by Banta for the three hundred and twenty conveyed to Mrs. Creveling and for the Gilmore ranch of four hundred and eighty acres, with 6 per cent. per annum interest, unless the Crevelings elect to convey said lands to Banta instead of allowing such credit.

VII. Reverting now to the controversy between Alexander Creveling and Banta, it will be recalled that the latter had disposed of three hundred and thirty-nine acres of land to Walcott. The evidence shows this to have been then worth $22 per acre, or $7,458. It also appears that Banta placed an incumbrance of $2,000 on the eighty acre tract awarded to Creveling. These sums, amounting to $9,458, should be charged to Banta, and he should be credited with the $1,623.34 heretofore mentioned and the $8,000 mortgage on the land, making $9,623.34. The remaining installments of the $910 were paid, but solely for the convenience of Banta, and Banta should be credited with the present worth of the last eleven of these and five-sixths of the other, computing interest at the rate of 6 per cent. per annum as of the date when paid. Otherwise Creveling would be charged with the expense of Banta's exploitations in making new loans. Aside from the above Banta should be charged with the $1,137.75 advanced by Nicholson, and also the portion of the several loans made by him to Banta set off against Alexander Creveling's land. Interest should be computed from the time of the respective payments at the rate of 6 per cent. per annum, and judgment entered against Banta for the balance against him. The record is not as clear as it might have been, and there may be found discrepancies in the computations, or items may have been omitted. If so, correction may be made in the entry of decrees in the district court, for which purpose, and also for an accounting of rents and profits, the cause is remanded.—*Reversed.*