## WRIGHT et al. v. SCONYERS et al.

No. 19986.   Opinion Filed June 23, 1931.

Goode, Dierker & Goode, for plaintiffs in error.

G. C. Abernathy, Edward Howell, and E. D. Reasor, for defendants in error.

RILEY, J.   Plaintiffs in error, plaintiffs below, appealed from the judgment and decree denying their petition to quiet title in and to certain premises in the city of Shawnee.

The substance of plaintiffs' claim is that on or about the 1st day of April, 1926, plaintiff Jessie A. Wright, then Jessie A. May, was the owner of said premises, upon which the Fidelity Building & Loan Association held a mortgage of about $1,400, and being desirous of conveying said property to her mother, Thirza L. May, signed and acknowledged a deed conveying the same, but left the name of the grantee and the consideration blank, and mailed same from Baton Rouge, La., where she resided, to her mother in Shawnee; that when the letter containing the deed arrived in Shawnee, her mother was temporarily in the state of Mississippi; that N. F. May, father of Jessie and the husband of Thirza L. May, without the knowledge or consent of Jessie or her mother, and the defendant R. L. Sconyers caused Sconyers' name to be inserted in said deed as grantee, and inserted the purported consideration of $2,500, and entered into a certain agreement between themselves whereby it was agreed that Sconyers would make or cause to be made certain repairs

and improvements on the premises, and would then sell the premises to the best advantage, and after reimbursing himself for all expenses laid out, after paying himself the sum of $300 for his services out of the proceeds of said sale, would pay the balance to said N F. May; that thereupon Sconyers mortgaged said premises to the said building and loan association for the sum of $2,500, and paid, or pretended to pay, out the money thus received in repairing the building and improving the premises; that thereafter, Sconyers, without the knowledge or consent of plaintiffs, sold and conveyed the property to defendants J. I. Cunningham and Edith B. Cunningham, and refused to pay any part of the proceeds of said sale to plaintiffs, or either of them; that defendants Cunningham at all times well knew that plaintiffs were the owners of said premises, and had never conveyed nor consented to the conveyances to Sconyers, and the Cunninghams took title with full knowledge of all the facts. They prayed for cancellation of all said conveyances, and that they be reinvested with the title, etc.

Defendants James I. and Edith B. Cunningham answered by general denial, and pleaded at length that they were innocent purchasers for value without notice of any defect in the title of Sconyers, and by crosspetition asked that title be quieted in them, or that, in case plaintiffs were adjudged to be the owners of said premises, they be reimbursed for all moneys paid out and have judgment against defendant Sconyers for damages in the sum of $1,000, which sum they claimed they would lose as profit on the deal in case plaintiffs were adjudged to be the owners thereof.

Defendant Sconyers, by amended answer, denied generally all the allegations of plaintiffs' petition, and further alleged, in substance, that when the deed mentioned in plaintiffs' petition was signed and acknowledged by Jessie A. May, the property was mortgaged for about $1,400; that the taxes for the previous year were unpaid; that the property was in such need of repairs and the price of real estate so low, that Jessie A. May executed said deed leaving the consideration and name of the grantee blank, and delivered said deed to her father, N. F. May, with instructions to him to dispose of the property to the best advantage; that subsequent thereto the contract referred to by plaintiffs was entered into between himself and N. F. May, and the said contract had been carried out in good faith, and the property sold Cunningham in compliance therewith, and that he had received no more

than the $300 provided in said contract, and that all the money received for said property over and above said sum had been paid out by him in carrying out said contract in making the necessary repairs, and in payment of the necessary expenses and taxes, etc.

It appears that the cause was at one time tried to a jury, and in the course of that trial an order was made sustaining a demurrer to the evidence of plaintiffs as to Thirza L. May, and the petition dismissed as to her, and thereafter, because of the sickness of a juror, a mistrial was directed as to the plaintiff Jessie A. Wright and the defendants. Thereafter the cause was tried to the court upon the express request of defendants, and upon a waiver of a jury by plaintiff, resulted in a finding and judgment for defendants. From this finding and judgment, plaintiff Jessie A. Wright appeals and joins her mother Thirza L. May as plaintiff in error.

Two specifications of error go to the admission and exclusion of certain evidence. These specifications are not urged in the briefs, and will be considered as abandoned. All other specifications of error go to the sufficiency of the evidence, or to where the weight thereof lies. They are presented under three propositions: The first is that the deed executed in blank and delivered to an agent, with instructions to fill in the name of the grantee and deliver the same upon such terms and conditions and at such time as the agent shall determine, in order to convey title, must be filled in and delivered to the grantee by the designated agent, and the second proposition is substantially the same. The third is that the judgment is against the weight of the evidence.

That the deed in question was signed and acknowledged by Jessie A. May of Baton Rouge, La., without the name of any grantee being inserted, and without any stated consideration, is beyond question. That the deed was mailed by Jessie A. May to her mother, Mrs. N. F. May, seems to be beyond question. The principal question in controversy seems to be what instructions were given in the letter accompanying the deed. It is the contention of plaintiff that she instructed that her mother's name be written in the deed as grantee. Defendants contend that the substance of the letter was for her mother "to fil in anyone's name, whoever she could get to take the debt off her hands." The letter was lost or destroyed and some 250 pages of testimony were deemed necessary, or at least were taken, on these controverted facts. It is shown beyond question that the name of the grantee and the state-

ment of the amount of the consideration were not filled in by Mrs. N. F. May, but were inserted by some third party, probably at the instance of Sconyers and N. F. May. The evidence is in hopeless conflict as to how this came about. At that time Jessie A. May was not married. She testified positively that prior to May, 1924, she owned the property in question and lived in the house with her father and mother; but after May, 1924, she had not lived in Shawnee; that in May, 1926, she lived in Baton Rouge, La., where she was employed as a stenographer; that on May 27, 1926, she signed and acknowledged the deed in question with the name of the grantee and the consideration left blank; that on May 31st, she mailed it to her mother, addressed to her as Mrs. N. F. May; that with the deed she enclosed a letter instructing her mother to insert her name in the deed as grantee; the letter was not produced, it being explained that the same had been lost or destroyed. In explanation of why she prepared the deed in this form, she testified that she desired to provide a home for her father and mother, and had, a short time prior thereto, written to some one of the girls who worked in the office at Shawnee where she had formerly been employed, and obtained two blank Oklahoma form warranty deeds; that one of these she filled out conveying the premises to her mother in the name of Mrs. N. F. May; that she mailed this deed to her mother, and that the same was returned to her by her mother with the suggestion that the name of the grantee had better be written with her Christian name rather than the initials "Mrs. N. F."; that she was uncertain whether her mother's name should be written Thirza Lolette May or Thirza Kennison May, and for this reason she left the name of the grantee to be filled in by her mother, and mailed the deed to her as above stated; that she never at any time consented that the name of Sconyers be inserted as grantee; that she never at any time instructed or authorized her mother or any other person to insert the name of Sconyers as grantee; that she never learned that it had been inserted until about January 17, 1927; that she never knew anything whatever about the contract between Sconyers and her father until about July, 1926, when her father sent her a copy of it, whereupon she promptly wrote her father repudiating the contract and directing him to cancel it at once; that she had never received any consideration for the deed.

Mrs. Thirza May was a witness for plaintiff and corroborated Mrs. Wright as to the mailing and return of the first deed and the reasons for its return. She testified, further, that she had never seen the last deed (the

one in question); that she was called to Mississippi on account of the sickness of another daughter, and left Shawnee on June 2, 1926, before the letter containing the deed was delivered in Shawnee, had never seen and knew nothing about the contract between Sconyers and N. F. May, until about December after Sconyers had conveyed the property to the Cunninghams.

N. F. May testified for plaintiff, in substance, that sometime before the deeds mentioned were mailed, he and his wife, at the suggestion of Jessie A. May, had listed the property for sale with a number of real estate dealers, and that they had Mr. Sconyers trying to sell the premises; that the first deed was received as testified to by Mrs. May; that Sconyers had seen this deed, and that they had discussed the matter and thought that perhaps it might not be good, as the name of the grantee therein, "Mrs. N. F. May," could be someone else, and that they might have trouble with an abstract with a deed in that condition, and it was decided to send it back and have another deed executed; that Sconyers had suggested that they could have the name of Thirza May inserted in it, or could have it signed in blank and then when someone was found to buy the place, "we could insert the name in it"; that the first deed was sent back by Mrs. N. F. May; that he went with his wife to Mississippi before the letter containing the second deed was delivered in Shawnee; that he returned to Shawnee about June 7th or 8th, and that Mrs. N. F. May remained in Mississippi, and had never returned to Shawnee until the date of the present trial; that he opened the letter containing the deed and the letter accompanying it about that time, and had a conversation with Sconyers about selling the place; that Sconyers advised him that the place could not be sold in its then condition; that the house was in need of repairs, and that "it will sell more readily if put in good repair"; that he suggested to Sconyers that the second deed should be mailed to Mrs. N. F. May, and she could keep it, and then they could mortgage the premises to obtain the money to repair the house; that Sconyers had said that this was unnecessary; that "he would give me a contract against it and me to give him the deed and let him write his name in it"; that accordingly the contract between himself and Sconyers was entered into, and he delivered the deed to Sconyers; that he never had any instructions whatever from Jessie A. May so to do, and that she knew nothing about the arrangements or the contract until about July 26th, when he mailed her a copy of the contract.

The testimony of these three witnesses covers something more than 100 pages of the record, but this is a fair summary of the substance thereof. Many details are omitted. Some of the more important of those will be mentioned later.

The evidence of defendants with reference to how the transaction was handled covers something like 100 pages of the record, besides the exhibits, and cannot be set out herein at length.

Defendant Sconyers testified, in substance, that he had lived in Shawnee many years, and had known the plaintiff since about January, 1924; that he lived next door to the Mays; that he drove a laundry wagon and sometimes sold real estate; that sometime about the middle of April, 1926, he went to the home of Mr. and Mrs. May at their request; that he had a conversation with them in which they told him that Jessie A. May was far behind with her payments to the loan association, and that the 1925 taxes had not been paid, and that they wanted him to try to help them sell the place; that he took a number of people to see the place, and did his best to sell it, but was unable to find a buyer; that his efforts continued up to about the 20th of May, when Mrs. May told him something must be done, that the loan company was getting very urgent for its money; that he suggested that a deed be prepared in blank and sent to plaintiff Jessie E. May for her signature; that they agreed that this should be done in order to save time in case a purchaser should be found; that accordingly he procured a blank deed and went to the office of the building and loan company and had the deed prepared in blank and took it to Mrs. May, and she mailed it to the plaintiff Jessie A. May. He identified the deed in question as the one he had prepared; that on May 30th, he next saw the deed. On that morning Mrs. May called him and told him that she had received the deed from Jessie A. May, special delivery; that he went over that afternoon and Mrs. May showed him the deed; that he saw the envelope in which it came, and saw that it had a special delivery stamp on it; that he saw and read the letter accompanying the deed, and that the instruction therein as to filling in the name of the grantee was:

"Kind of in substance for her mother to fill in anyone's name, whoever she could get to take the debt off her hands."

That this was on Sunday, and that the next afternoon he again had a conversation with Mr. and Mrs. May, in which they informed him that the building and loan company had notified them that unless a payment

w'as made by the first of June they would be compelled to commence foreclosure proceedings; that they talked the matter over at some length as to what could be done. As to just what was done and how the deed was delivered to him, he testified:

"A. We talked on terms as to how we would handle it, and I made the proposition to Mrs. May that I would accept a deed to the place, and help them finance the place; in other words, to keep a foreclosure from going against Jessie, I made the proposition I would accept the deed to the place, and repair it and sell it as soon as I possibly could, but I would not guarantee them one dollar or anything over and above what I might have expended on it, and I told them, I think, my services would be $300. Mrs. May says, 'I think that is a little bit high.' Mr. May says, 'Under the conditions, I don't think it is.' She says, 'All right,' and she turned this deed and the little pass book over to me that night. Q. You are handed defendant's exhibit 17, and asked if that is the pass book she turned over that night. A. Yes, sir; it is. Q. You started to say you 'agreed' what was said, what was done. A. We agreed. Q. No, what was said? A. Mr. May was to meet me the next day down at the Federal National Bank, which we had not made any arrangements for any money, and I went down there and went on his note for $60. and that brought the difference up to $98.26, and he gave me that and I made a deposit to my credit because I carried my deposit at the bank, and I went his note for $60, and went to the Fidelity and gave them my personal check for $98.26."

He testifies quite positively that all of this occurred before Mr. and Mrs. May went to Mississippi. He then testifies concerning the preparation and execution of the contract between himself and N. F. May, which follows in general terms the oral arrangements about which he testified.

We have set out at some length the substance of the testimony of these four witnesses, and, as stated before, they show a direct conflict as to how the deal came about, and particularly in the directions given by plaintiff as to the insertion of the name of the grantee in the deed. So far as the direct evidence is concerned, the weight would seem to be with plaintiff. But the record contains evidence of facts and circumstances which, as we view the record, renders it almost impossible to believe that the transaction took place in the manner testified to by plaintiff and her witnesses. It is unquestioned that plaintiff was behind in her payments to the loan company. On October 19, 1925. plaintiff wrote to Mr. George E. McKinnis, the president of the building and loan association as follows:

"October 19, 1925.
"Baton Rouge, Louisiana.
"Mr. Geo. E. McKinnis, President,
"Fidelity Building & Loan Association.
"Shawnee, Oklahoma.
"Dear Mr. McKinnis:

"I received your kind letter several days ago, and have been endeavoring every way I could to be in a position to write you definitely just what I can do, and if no ill luck befalls me I can send you $10 each Saturday now for two months, which will bring up the delinquent amount quite a bit. I am enclosing herewith a check for $10 to be credited on the loan, if this arrangement will be all right with you. If it is not, I'll just have to give the effort up and quit. I have a world of fighting spirit in me against odds, but I've had such a tremendous amount of trouble and expense to battle for the past six years for my folks that it has simply weakened my ambition 'to never give up' without reaching the goal I set at the beginning of any plan. You already know this, I suppose, but I mention it so you may know that I am still heavily burdened and not merely shifting the obligation I owe the Fidelity because you happen to be patient and kind about it. I certainly appreciate that, and for that reason am more anxious to make good. You will please advise me if this plan will meet with your approval so I may know what to do about it.

"I have tried and tried to find out the amount of taxes due, but they advise me it is $80 plus, which is $6 more than last year's taxes plus the year's fine, and I don't see how that can be right. I've already sent a check for the personal tax, so that should not be included.

"I might mention that after the two months I mentioned elapses, my younger brother and sister will be able to help or maybe take up the payments from that time on, as my brother has a very good job here for a boy his age and can begin helping me real soon."

To this letter the company replied:

"October 22, 1925.
"Miss Jessie A. May,
"Box 695,
"Baton Rouge, La.
"Dear Miss Jessie:

"Yours received and carefully read. Rest assured that we want to do everything we can to aid you to carry out your plans. In no sense do we want to increase your embarrassment.

"Let the $10 come forward each week, and we will endeavor to go along with you just as long as we can. I am sure that there is no lane but what has a turning, and I trust that you will soon turn the corner and meet a more happy situation.

"Please herewith find credit slip for $10.

"As to the taxes, we will look into the matter and advise you later."

Subsequent payments of $10 each were made by plaintiff on October 30th, November 9th, and November 25th. Plaintiff made no payments after the latter date. On April 29, 1926, the loan company wrote plaintiff as follows:

"April 29, 1926.
"Miss Jessie A. May,
'Box 695,
"Baton Rouge, Louisiana.
"Dear Miss May:

"In checking back over your loan account we find that no payment has been made since the 25th day of November. This took care of part of the October interest. We had been applying the $10, which you sent to your interest alone, trying to bring this up to date. We also took care of the 1924 taxes, which amounted to $97.24, and withdrew it from the amount that you had already paid in cn your stock so as to stop the 18% that this certificate was drawing.

"I believe the above will give you some idea as to the condition of your loan, and now, Miss May, we feel that we will have to do something with this account. The interest due to the first of May amounts to $74.94. I have not checked the taxes for 1925, so do not know whether they have gone delinquent or not. We have tried to give you every consideration and hope you do not feel that we are unnecessarily pushing you at this time, but after a loan has gone as much as six months, it is really necessary that some action must be taken.

"Please let us know what you consider doing with this matter."

On May 16th, plaintiff replied as follows:

"May 16, 1926.
"Miss Edith L. Young, Secretary,
"Fidelity Bldg. & Loan Assn.,
"Shawnee, Oklahoma.
"Dear Miss Young:

"I received your letter a week or more ago, in regard to my property in Shawnee. I hardly know what to say to you about it, other than that I have done all that I can. I offered to give Mr. McKinnis a deed a number of times, but he was kind enough to encourage me in trying to redeem the property, and because of this courtesy, I did try to pay up until last December. I realized then that unless the rest of the family felt interested enough in providing a home for mother and father and helping them to retain it, that it was gone up, as I can no longer pay all expenses there.

"I listed the property with every real estate dealer in Shawnee that I thought could sell it, and I especially urged Mr. Nabors and Mr. Taylor to sell it for me. Then I asked my folks to try and sell it so that we could get enough to pay off the loan,

at least, but nothing has been accomplished so far. As far as I can say now, a sale of the property is all that would enable me to pay the loan and it seems that a sale is impossible.

"At the time the taxes were paid for 1924, they amounted to $74 and some few cents, and as the amount was deducted from the principal I had paid on the loan, I had no idea the 18% was still accruing on it to reach the amount of $97.24, by now over $20. At that rate the 1925 and 1926 taxes will soon be that much each. I mailed the credit book to my mother today, and whatever you think best to do, I shall be glad to be advised and execute a deed when you wish it, or pay up if the property sells anytime soon."

On May 22nd, the loan company replied to this letter as follows:

"Shawnee, Oklahoma.
"May 22, 1926.
"Miss Jessie A. May,
"Box 695,
"Baton Rouge, La.
"Dear Miss Jessie:

"We are herewith handing you deed, which please sign and have acknowledged before notary public and return to us at your earliest convenience. On the receipt of the deed we will cancel note and mortgage and send to you.

"We are taking this course in compliance with your letter of the 16th instant, rather than foreclose and take a deficiency judgment against you. It is our policy to do everything that we can to encourage and help our borrowers to take care of their loan obligations, but when they absolutely feel that they cannot go further, there isn't but one thing to do, and that is to either take a deed or foreclose and sell the property, and if the property doesn't bring an amount necessary to satisfy the loan and accumulated indebtedness, take a deficiency judgment against the borrower. But we do not want to do this in your case. We know that you have done everything that you can and that you have had but very little help and encouragement from any one in this matter; therefore we are willing to follow your suggestion and relieve you of this burden, and if there is any loss to be taken take it ourselves.

"There will possibly have to be considerable improvement made on the property before it will sell for anything like the mortgage. I think, however, with $500 or $600 spent on the property at this time, we may be able to dispose of it on a long term contract, and get, if not all, the major portion of our money back. At least this is the route that I have decided to take."

Plaintiff testified that she signed and acknowledged the deed in question on May 27, 1926, but did not mail it until late on May

31st. N. F. May testified that the letter containing this deed did not arrive in Shawnee until June 2, 1926, after he and his wife had gone to Mississippi. Mrs. N. F. May testified that she never saw the deed. If they be not mistaken in this, of course, it would have been impossible for Sconyers to have seen the deed and letter accompanying it on the 30th day of May and on the 31st day of May as he testified. But Sconyers is corroborated to some extent by facts and circumstances which compel us to the conclusion that plaintiff and Mr. and Mrs. May are mistaken.

Mr. Frank S. Roodhouse, the postmaster at Shawnee, produced the record of the special delivery of a letter to Mr. and Mrs. N. F. May on May 29, 1926, at 8:30 o'clock a. m. The record shows that this letter had been mailed at Baton Rouge, La. The receipt for the letter was signed by Mrs. N. F. May. A special delivery messenger testified to the delivery of this letter to Mrs. N. F. May as shown by the receipt. The postmaster testified that the record did not show any other such special delivery letter between May 15th and June 15th of that year. No explanation appears to have made by the witnesses for plaintiff as to what this special delivery letter contained, or the occasion for the sending thereof unless it was the delivery of the deed as testified to by Sconyers. When this circumstance is taken in connection with all of the correspondence between plaintiff and the loan company, and the subsequent transactions relative to the surrender by plaintiff of her stock in the loan company, and the transfer of the insurance on the building, it shows almost conclusively that the version of defendant Sconyers is in the main correct. This view must have been taken by the trial court, otherwise it could not have found generally in favor of all of the defendants as it did.

It is urged, however, that even though a grantor in a deed conveying real estate, signed and acknowledged with a blank for the name of the grantee, may authorize another party to fill in the blank, there are two conditions to make the deed thus executed a conveyance of the property described in it: First the blank must be filled by the party authorized to fill it: and second, this must be done before or at the time of the delivery of the deed to the grantee named.

This seems to be the law in some jurisdictions, and is expressly stated in Allen v. Winthrow, 110 U. S. 119, and Telschow v. Quiggle (Ore.), 145 Pac. 11 wherein it was held:

"A deed with a blank for a grantee is a conveyance only where the blank is filled by one authorized to fill it, before or at the time of delivery to the grantee, and on compliance with the conditions imposed by the grantor."

But in the latter case language is used which would seem to indicate that, as the agent there found one with whom the trade could be made for land as contemplated in the original agreement, the agent might fill in the name of such person. The court said:

"Tucker had no authority to fill in the name of Quiggle as grantee in the deed, or any other person's name except on the condition named by Telschow, to wit, upon the conveyance to the plaintiff of a farm in the Willamette Valley."

The earlier cases lay down rather a strict rule against allowing any person other than the one designated by the grantor to insert the name of a grantee in such deeds. Unquestionably the authorities are in conflict on this particular question. We think, by the great weight of modern authority, the rule is now otherwise. In most, if not all, of the western states, where this question has been passed upon, it has been held that it matters little by whose hand the blank is actually filled up, so long as it is done at the direction of the person designated by the grantor. Board of Edu. of the City of Minneapolis v. Hughes (Minn.) 136 N. W. 1095; Hall v. Kary (Iowa) 110 N. W. 930; Crevling v. Banta (Iowa) 115 N. W. 598; Wright v. Heyting (Wash.) 203 Pac. 935. In the latter case, it was held:

"A deed signed, acknowledged, and delivered by vendor to a broker, with authority to insert the name of the grantee to whom he should effect a sale, did not become ineffectual to convey the land because the broker directed the grantee to write his own name in the deed; the effect thereof not being to delegate to grantee the power to choose or decide who the grantee should be."

The latter case is in many respects similar to the instant case. It is directly in point, if we consider plaintiff's mother and father as her agents to find a purchaser for the premises. Her letter to the loan company shows that they were.

In some cases it is held that deeds so signed and acknowledged are valid and sufficient to convey title when a purchaser is found willing to accept the premises under the terms fixed by the grantor.

In Threadgill v. Butler, 60 Tex. 599, it was held:

"(1) The verbal authority given by the vendor to fill the blank with the name of the grantee, or with any other name, was sufficient.

"(2) The power to fill the blank was a power coupled with an interest, and was irrevocable.

"(3) The fact that the purchaser had sold the land to another before he executed his power to fill the blank did not work a revocation of his authority."

In Schleicher v. Runge (Tex. Civ. App.) 37 S. W. 982, it was held:

"It is competent to prove by parol the circumstances under which a deed executed in blank as to the consideration and name of the grantee was delivered, and the power arising therefrom in the purchaser, or any transferee from him, to fill the blanks."

In Guthrie v. Fields (Kan.) 116 Pac. 217, it was said:

"The modern, and, as we think, the better rule is that authority may be given by parol to insert the name of a grantee in a deed, even after delivery, and such authority may be implied from the circumstances. 2 Cyc. 159- 160, 168-172; 3 Enc. L. & P. 431-435. We do not regard it as material by whose hand the blank is filled."

It will thus be seen that the tendency is to uphold such deeds where the effect thereof is to carry out the intention of the grantor.

From the record it appears that, at the time the deed was signed and acknowledged, it was clearly the intention of the plaintiff that her father and mother find a buyer for the premises as quickly as possible, and to enable them to promptly close a deal the deed was signed and acknowledged in the manner shown and mailed to Mrs. May with permission or direction to insert the name of any person as grantee who would accept title and assume the mortgage indebtedness against the premises. Her mortgage was released, she surrendered her stock and transferred the insurance, and obtained in all respects that which she apparently desired as expressed in her letters to the building and loan company. The fact that the property may have greatly increased in value by reason of conditions arising shortly thereafter may make it unfortunate for plaintiff that she was unable to hold the property until these conditions arose, but we think that does not justify setting the deed aside under the conditions shown by the record.

A careful examination of the entire record, we think, also shows that the defendants Cunningham had no notice or knowledge of the conditions under which the deed was signed and acknowledged and delivered to Sconyers, and, in fact, were innocent purchasers without notice of the defect, if any, in Sconyers' title.

The judgment is not against the clear weight of the evidence, and is therefore affirmed.

LESTER, C. J., and HEFNER, SWINDALL, ANDREWS, McNEILL, and KORNEGAY, JJ., concur. CLARK, V. C. J., and CULLISON, J., absent.