R. H. GRAY, Appellant, v. GEORGE E. BRICKER et al., Appellees; F. C. HUBER et al., Appellants.

CONTINUANCE: Absence of Witnesses—Admission of Controverted
1 Matter. Continuances on the ground of the absence of witnesses are very properly denied when the matters sought to be proven are either admitted or not controverted by the opposite party.

APPEAL AND ERROR: Review, Scope of—Order Setting Aside De-
2 fault. Clear showing of abuse of discretion must appear, be-

fore an order opening up a default will be overruled by the appellate court. So held where a default was set aside on conflicting evidence bearing on defendant's conduct and on the matter of sickness in his family, etc.

**BILLS AND NOTES:** Negotiability—Instruments Negotiable—Assumption of Note of Another—Mortgages. A contract to assume and pay the negotiable promissory note *of another* is not impressed with any law of negotiability. In other words, such collateral promisor may plead against a holder in due course of such note any defense which he might plead against the party for whose benefit he made such collateral promise.

**VENDOR AND PURCHASER:** Rescission by Purchaser—Fraud—Non-Necessity to Show Scienter. *Scienter* need not be proven in order to effect a rescission for fraud.

**VENDOR AND PURCHASER:** Rescission by Purchaser—Reasonable Time—Laches. Rescission must be made promptly upon discovering the inducing fraud; but there is no exact standard of diligence to discover the fraud (especially when the defrauder knows that his victim is implicitly relying on his fraudulent statements), and no exact standard of *time* in which the vendee must rescind after obtaining proof of the fraud. Where fraud was discovered many months after the sale, *held*, a rescission made some six months later was timely, in view of lack of substantial prejudice to those opposing rescission.

**VENDOR AND PURCHASER:** Rescission by Purchaser—Restoration of Status Quo—Money Judgment. Rescission demands the restoration of the *status quo;* therefore a defrauder may be compelled to return to his victim the value in money of the property received by the defrauder and later disposed of by him, and likewise any other sum paid by the one defrauded for the use and benefit of the guilty party.

*Appeal from Harrison District Court.*—A. B. THORNELL, Judge.

FEBRUARY 8, 1918.

SUIT to foreclose two mortgages resulted in a decree as prayed. Subsequently, Bricker and wife were allowed to interpose a defense, and to file a cross-petition against Huber. On hearing, the decree was modified, and judgment was entered on the cross-petition against Huber. The plaintiff and Huber appeal.—*Affirmed.*

*McCulla & McCulla* and *J. S. Dewell,* for appellants.

*Roadifer & Roadifer* and *J. H. Rhode,* for appellees.

LADD, J.—I.   In 1912, Bricker negotiated an exchange of a tract of land in Holt County, Nebraska, for a lot, with building, occupied by what was known at the Electron Sanitarium, in Omaha, Nebraska, subject to an incumbrance of $1,800, receiving a conveyance thereof in January, 1913. Negotiations by Huber, conducted at about the same time, resulted in the exchange of a tract of land in Meade County, South Dakota, to one Loomis, for the NW¼ NE¼ and W½ SW¼ NE¼, and the W½ NW¼ SE¼, and the W½ of Lot 7, all in the E½ Section 34, in Township 78 North, Range 45 West of the 5th P. M., in Harrison County, Iowa, containing 99.8 acres, according to the government survey. The agreed difference was $2,500, and Huber and wife gave Loomis their note for this amount, and secured its payment by mortgage back on the land. Loomis had a deed from one Wood, with place for grantee's name blank, and Huber's name was inserted therein, and the deed handed to him. The note was endorsed without recourse to E. M. Unger, who paid value therefor without notice of any infirmities therein. This note and mortgage were assigned by Unger to the plaintiff for collection. Subsequently, Bricker traded his lot and the Electron Sanitarium in Omaha to Huber for his land in Harrison County, and with his wife, executed a note to Huber for the agreed difference of $1,250, and a mortgage on said land to secure its payment. Huber transferred these to plaintiff, as collateral security for a loan of $1,000. The evidence indicated that plaintiff acquired the note and mortgage without notice of any infirmities therein. The deed from Huber to Bricker recited that the latter assumed the payment of the $2,500 incumbrance. Suit to foreclose these mortgages and for judgment on these notes was begun February 10, 1915, and, on March 12th follow-

ing, judgment and decree by default, as prayed, were. entered against Bricker and Huber and their wives. Special execution was issued, and the mortgaged premises sold thereunder. General execution was issued for unsatisfied portion of the judgment, and was levied on property of Bricker in Madison County.

1. CONTINUANCE: absence of witnesses: admission of controverted matter.

Thereafter, and, on May 18, 1915, Bricker and his wife filed a motion to set aside the default and decree against them. Hearing was set for May 29th following; but, at that time, plaintiff moved that this be postponed, in order to take the depositions of three witnesses residing at Earlham, for that they had refused to make affidavits, and could not be compelled to attend court at Logan, as the latter place was more than 70 miles distant; and said witnesses would testify, in substance, that Bricker attended his store practically every day during his wife's illness. The court overruled the motion, reciting, in its order: "Defendant at this time admitting matters set out in .the affidavit respecting the service as to George E. Becker." The only reference to such service in the motion to continue, was the allegation that plaintiffs' attorney began investigation "as to the service of the original notice herein, and the condition and conduct of · the defendants Becker and Becker, at the time of the service of said notice, and from that time to the filing of the motion herein," and that such conduct was as above stated. These must have been the matters referred to as being admitted; else the recital of the admission is meaningless. Moreover, the record leaves no doubt that the original notice was duly served, and Bricker did not pretend to have attended to necessary business at his store. There was no error in not postponing the hearing.

Hearing was then had, and it was made

2. APPEAL AND ERROR: review, scope of: order setting aside default.

to appear that Mrs. Bricker was served with the original notice February 11, 1915,—she waiving the reading of it,—when about to be confined; that, without reading, she directed a woman in attendance to put it away in a bureau drawer, and returned to bed, and did not recall the matter again or discover the notice until about the 7th of May following; that she was delivered of a child on the same day; that she caught cold about two weeks thereafter, and did not recover for about two months; that the child was stricken with pneumonia, when about ten days or two weeks old, and was dangerously sick for about three weeks, when a relapse occurred, and he did not recover his health until the latter part of April; that, owing to these circumstances, she was unable to leave her home more than once or twice until about May 1st; that the loss of a child in the spring of 1913 from pneumonia increased her anxiety greatly. All this appears from the affidavits of Mrs. Bricker, the physician attending her, the sheriff of the county, and her husband. The latter corroborated the details recited by his wife, and swore that, because of facts recited, they were unable to get away to attend court in Harrison County, and could not have done so prior to the middle of April. On the other hand, one of plaintiff's attorneys testified that he wrote Bricker twice, at least, concerning his obligations, and, about April 26, 1915, visited him at Earlham, when they talked about the judgment, Bricker saying that he had nothing with which to pay; that, if they made him do so, he would compel Huber to reimburse him; and, upon inquiry as to why he made no defense, responded that his father-in-law had advised him to pay no attention to the letters or the notices served, and that, if an attempt were made to collect the judgment, then to stop the collection; and that Bricker then turned over to him a blank or deed of land in Gregory

County, South Dakota, with the understanding that the attorney would investigate its value, and let him know what he would allow therefor on the judgment; and that Bricker said nothing about sickness in his home, nor concerning any irregularity in obtaining judgment.

Bricker denied this, in saying that he did not understand that the attorney was undertaking to collect a judgment, but supposed he wanted payment on the notes; and testified that he first knew that a judgment had been entered May 7th following, and that the attorney, if he found the land satisfactory and that the deed would satisfy the mortgages, was to use it,—otherwise, not to do so. )

Rhode, father-in-law of Bricker, denied ever having advised Bricker as the attorney swore Bricker had informed him, and stated that he first learned that suit was brought, or decree entered, after the general execution was levied. On this showing, the motion to set aside the default and decree and hear the cause on the merits was sustained. That the showing was sufficient as to Mrs. Bricker cannot be questioned; and the circumstances recited were well calculated to distract the attention of Bricker, and prevent him from leaving Earlham to attend court, or even to consult and employ counsel. Though not strong, the showing was not void of merit.

Courts favor hearings on the merits, and only on a clear showing of abuse of the large discretion with which a trial court is clothed will its order in setting aside default and allowing a hearing on the merits be interfered with on appeal. *Mally v. Roberts*, 167 Iowa 523. We are not inclined to interfere in this case.

II. The plaintiff was shown to have been an innocent purchaser of the $1,250 note and mortgage, and for this reason, the defense of fraud was of no avail as against recovery thereon. It is contended, however, that, although Bricker did not sign the $2,500 note, he assumed its payment in ac-

3. BILLS AND NOTES: negotiability: instruments negotiable: assumption of note of another: mortgages.

cepting the deed; and therefore, as Unger acquired this note for value, and without notice of the fraud alleged, such defense might not be interposed. As between the Hubers and Brickers, the latter, by assuming the payment of the debt as a part of the consideration for the conveyance, became principals, and the Hubers, sureties. *Bossingham v. Syck*, 118 Iowa 192.

But this obligation arises from the contract implied from the acceptance of the deed, and not owing to the terms of the promissory note; and, though such contract may affect the security of the note, it has no bearing on its negotiability. It amounts to no more than a contract with one person to pay the debt of another to a third person; and, under the law of this state, the latter may recover thereon. *Beeson v. Green,* 103 Iowa 406.

But such a contract is not impressed with the law of negotiability, even though the indebtedness undertaken to be paid be that evidenced by a promissory note, and is subject to defenses such as may be interposed to the enforcement of other contracts.

4. VENDOR AND PURCHASER: rescission by purchaser: fraud: non-necessity to show scienter.

III. The land in Harrison County consisted, as appears from the description, of a narrow strip, extending along the river in the east half of the section. At the north end, it was widest, and disappeared farther south, as the river flowed to the southeast; and as, farther down, it veered to the west, there may have been a very small area there.

Wayne, an engineer, upon examining the land, estimated that not to exceed 25 acres of the description were out of the river; while Stern thought there were not more than 10 or 12 acres; and Smith, who was with Stern when they looked, fixed the limit at 15 acres. This evidence was without conflict. Huber represented to Bricker that the river there flowed to the east and had cut off half an acre from

the north end of the 100 acres described; that 40 acres of corn had been put in; that the remainder was in pasture; and that the land was worth $80 per acre. All this was relied on. by Bricker in making the deal. As seen, it was false; but Huber was not shown to have known this. He informed Bricker that he had not seen the land, and was speaking from knowledge derived from Loomis. It may be that Huber knew no better; but that does not relieve him; for *scienter* need not be proven in order to effect a rescission. The rule which generally prevails is thus stated in 2 Warvelle on Vendors, 996:

"Representations which are untrue, and which materially affect the value of the property which forms the subject of the contract, will furnish grounds for a rescission, even though they may not have been made with a fraudulent intent. Indeed, the intent of the person making a misrepresentation for the purpose of inducing a purchase of property, is wholly immaterial. A party selling land or other property must be presumed to know whether the representations made by him are true or false; if he does know them to be false, he is guilty of positive fraud; but if he does not know, it must be from gross negligence, and false representations which are material, made under such circumstances, although founded on mistake, in contemplation of a court of equity constitute fraud, and will justify the rescinding of the contract."

Even though Huber believed that what he was saying was true, and Bricker relied thereon, then their deal was based on a mutual mistake, and Bricker had the same right to rescind as though Huber did not believe his representations true, or knew they were false. The answer and cross-petition were broad enough to include these different phases, and Bricker and his wife were required to prove no more than was essential to the relief prayed.

IV.　Appellants argue that Bricker and

5. VENDOR AND
PURCHASER:
rescission by
purchaser:
reasonable
time: laches.

wife did not elect to rescind within a rea-
sonable time after ascertaining that they
had been deceived as to the quality and
quantity of the land.　He testified that he
first ascertained the truth in December, 1914, and this is
not controverted.　If he expressed the opinion to Whitten
and Stewart, shortly after the trade, that he had the worst
of the deal, and talked about not conveying the Sanitarium
property,—which he denied,—and passed over the railroad
within two or three miles of the property on several occa-
sions, knowledge of the condition of the land is not to be
inferred therefrom.　The deal may have been disadvanta-
geous had there been as much land as represented.　For all
that appears, his suspicions were not aroused until later, as
he testified.　Indeed, he delivered the deed conveying the
Sanitarium property about the first day of April, 1913,
and he would not have been likely to do so, had he been ad-
vised concerning the amount of land which had been con-
veyed to him.　The circumstance that the Sanitarium and
the barn on the same lot had been damaged by a cyclone
does not obviate this conclusion, though the fact that the
deed was delivered without mentioning the injury to the
property may throw some light on the fairness of this trade.
The election to rescind was not made until the motion to set
aside the default was filed, May 18, 1915.　Was this too
late?　No change occurred in the meantime, other than the
beginning of the suit to foreclose in February, and the pro-
ceedings following.　But all this was essential, to enforce
the security against the land and obtain judgment against
the Hubers.　The only possible prejudice suffered was in
making these defendants parties, filing a transcript in
Madison County, and in levying execution and advertise-
ment on Bricker's property.　But all this was necessary in
enforcing the collection of the $1,250 note, and the prej-
udice in the delay as to the $2,500 was slight, if any.

Owing to these negotiable notes, outstanding and not due, Bricker might well have hesitated as to the course to pursue. His family was ill, in the meantime. Under the circumstances, and especially in view of the absence of substantial prejudice, we are not inclined to interfere with the conclusion of the trial court that rescission was elected within a reasonable time after the discovery of the fraud or mistake. *Conroy v. Coughlon Auto Co.*, 181 Iowa 916.

V.    Something is said in the brief with reference to the duty of the person to ascertain the condition of property for which he is negotiating for himself. Huber was aware that Bricker was exchanging without examining the land, and doing so in reliance on his representations; and he is not in a situation to complain because Bricker believed what he said, instead of suspecting his veracity and ascertaining for himself that his statements were untrue. *Holmes v. Rivers,* 145 Iowa 702.

6. VENDOR AND PURCHASER: rescission by purchaser: restoration of *status quo* : money judgment.

The portion of the judgment against Huber for the $250 realized by him out of the Sanitarium property is criticised. On rescission, Huber was unable to return the property; and this was but awarding Bricker its value, in restoring him, as nearly as might be, to *status quo*. *Creveling v. Banta,* 138 Iowa 47. On this ground, judgment on Bricker's cross-petition against Huber for the amount payable on the $1,250 note, in event of its being first paid by Bricker, is to be approved. As the latter has satisfied the judgment against him, he should, in order to put him *in statu quo,* recoup from Huber. The sale of the land under execution, to satisfy in part the indebtedness on the first mortgage, was confirmed, thereby obviating any prejudice to plaintiff from the delay in interposing the defense of fraud. The decree has our approval, and is—*Affirmed.*

PRESTON, C. J., EVANS and GAYNOR, JJ., concur.