DELLA BOYLE, Appellant, v. MARY GELING, Appellee.

MARCH 13, 1928.

REHEARING DENIED NOVEMBER 16, 1928.

*E. R. Acres,* for appellant.

*Goheen & Goheen,* for appellee.

MORLING, J.—The defense is that defendant is of inferior mentality, and was induced by false representations to sign the contract sued on, and to pay the $700 which she did pay thereon. The plaintiff (a widow) is in the insurance business, has lived in Ossian 34 years, and is familiar with town properties and their

value. Defendant lived on a farm until about six years before the trial. During such six years, she was living in Ossian with her mother. Her work in town was cleaning a doctor's office, which occupied an hour each morning, and then she worked out by the day for her sisters. She had saved up $1,400, and had it in the bank in Ossian. Defendant's testimony, in substance, is that plaintiff called her into plaintiff's place from the street; that plaintiff told her she had a place to sell for $1,600, could rent it for $10 a month, worth $1,400, could sell it to someone else for $1,600; that, the second time plaintiff saw her, she told defendant "I ought to swipe mother's key away from mother's box, and rent a box for myself * * * I had notes in my mother's box, * * * $1,400. I told Mrs. Boyle I had bank notes in that box. * * * She told me I ought to ask my brother for money to put in the box. * * * I didn't tell Mrs. Boyle that this note was in the box,—no, I didn't. She told me I ought to keep still until after it was over, about this deal; then they could find out themselves,—not to say anything to my folks. * * * She said that property could be sold to Mrs. Kipp for $900, and could sell to Mrs. Berckmeyer for $1,600, and to Mike Kline said he wants it for same price. * * * I only went to school three or four years." She says she has been sickly all her life, and has not done any business for herself; that she went through all four rooms, looked the house over, inside and out; that plaintiff told her she ought to rent it out.

"Q. And you told her you would probably live there sometime yourself? A. Not right away yet. * * * Q. You told Mrs. Boyle you wanted to have a home for yourself after a while? A. She coaxed me into it. So long as mother was going to live, I wanted to live here."

She says that she didn't have any money to repair, after she paid the $1,400.

"I ask my brother for the key to the box in which this money was. I didn't tell him what I wanted it for. Mrs. Boyle [plaintiff] forbid me to tell. Mrs. Boyle said about getting away from my mother, I ought to hire a car and take my stuff over there in the evening to the house."

This is all denied by the plaintiff, who says she has known defendant for 30 years.

1210

"First time Mary [defendant] came to me to talk about buying the property was November, 1925. I didn't call her. * * * Never told her not to tell anybody. She said she would tell her mother nothing;- that she was 37. * * * She told me she was making curtains, and told me her mother asked her what she was doing, and she answered, 'None of your business.' I said I wouldn't dare talk to my mother like that."

"Q. You told Mary Geling at that time that it was worth $1,600, didn't you? A. No, I don't know as I did tell her anything of the kind. * * * I told her I held it for $1,600 at one time. * * * I said that she would have to get it plastered, painted, and wired, and she could rent it for $10 per month. I said I got $9 for it when it wasn't, and I knew she could get $10. * * * The last offer I had was $1,000. The highest cash offer was $1,250. I sold it once, that the party took me up on $1,400, but he wanted it on the installment plan; but he backed out."

This she says was Henry Miller, who is dead. Plaintiff says:

"Had a talk with a man that plastered the place, Walter Milbert. I went with Mary Geling to Mr. Milbert. She asked me to ask what it would cost to plaster. He said it would cost less than $40 to move the chimney where Mary wanted it, and to plaster the house. I had a talk with the electric light man. She said if she got the place, she wanted to wire it."

Plaintiff also says that she didn't know that defendant had a dollar to her name, until defendant said she was going to buy a place. She says that defendant asked her to go to the Figge bank, where defendant did her business.

"I think it was Mary who suggested going to the bank * * * When we talked about this contract, and she spoke about Mr. Figge, making it out, he said, 'I will get Mr. Allen. He is used to this work.' I said, 'It makes no difference to me.'"

Plaintiff says she thinks the property is worth from $1,500 to $1,600.

Plaintiff says that defendant "had two checks, one for $730 and one for $760. She [defendant] said the $90 would plaster the house." She says that she (plaintiff) wrote a check "for Mary Geling," and the banker handed her $30, and she handed

defendant $30; that she (plaintiff) wrote the "for" in the check, "because if I wrote it 'for Mary Geling,' I would give it to her, and I can remember what it is for. * * * Q. Wouldn't it be well for her to indorse it? A. Well, if I wrote 'Mary Geling,' but I wrote, 'for Mary Geling.' "

Defendant's sister testifies:

"The house,—the plaster is off, some laths are off, the floor is sunken, some windows are broken. The roof seemed to be sagged, and the porches are rotten. No cellar under the premises; no well. The boards on the walk or platform around the house, broken up and rotten. * * * My sister Mary went to school from 9 to 13. She told me the teacher carried her out, time and time again, when she fainted away. She isn't as strong as she ought to be. I don't know of her doing any business for herself."

That the house was badly out of repair, and was more than 40 years old, is undisputed, and these details by the sister are not denied. The lot is a corner lot, with cement sidewalks on two sides, but is low. The opinions on value range from $250 to $1,500. A witness says, and plaintiff denies, that plaintiff offered the place to her for $900, six years before the trial. Two of plaintiff's witnesses put the value at $1,200; another, from $1,200 to $1,500. Another of plaintiff's witnesses values the lot at $800 to $1,000, and the property $1,200 or $1,400, which would leave $400 for the house, or the improvements. The house had last been rented to a pauper at $8.00 per month. It was vacant at the time of the sale. Plaintiff appears to have paid $1,250 for the property. When, or in what condition the property then was, does not appear.

Inadmissible opinions that defendant is not capable of doing business appear in the record. Plaintiff testifies:

"The first time Mary Geling came to my house, she talked about her engagement to Pat Fitzpatrick; told me about what she was going to get ready to get married."

Defendant was asked, on cross-examination:

"Who was it you were engaged to be married to? A. Who spoiled it for me is what I would like to know. It was somebody.

I could tell you pretty quick who it was. Fitzpatrick. Somebody had to stick their nose in and spoil it for us last year.''

No reason appears why this working woman, with $1,400 or $1,496, should invest all of her savings in an old, dilapidated property, that for practical purposes was useless, except that given, which is that she was of subnormal mentality, easily imposed upon, and was purposely induced by plaintiff to believe that it was worth $1,400 to $1,600, could be fixed up for $96, and rented at $10 per month. Plaintiff's testimony, placing the initiative upon the defendant, admitting that she said that she held it for $1,600 at one time, that she told defendant she knew if it was plastered, painted, and wired, defendant could rent it for $10 per month, that she found out that defendant had money in the bank, that there was secrecy in the negotiations, which she attempts to blame on defendant, that she wrote the $30 check ''for Mary Geling,'' and paid her the cash, that the last offer she had was $1,000, and the highest cash offer $1,250, that the (now) dead man who she claims offered $1,400 on the installment plan backed out; plaintiff's answer to the question (referring to defendant's conduct in the purchase) ''You consider that the act of a person of good mentality? A. I think she is as smart as any of the family;'' the fact, as we think on the whole must be found, that the property was worth, to a person able to put it in repair, not much, if any, more than half the price agreed to be paid,—with the other circumstances in the record, lead to the conclusion that this contract is the product of imposition by a strong mind upon a weak one, of a fraudulently induced and ill founded belief. That defendant is simple-minded, and plaintiff knew it, is evident; that plaintiff, ascertaining that she had money, set about to induce her to purchase a dilapidated property at an excessive price, we think is clear. That plaintiff did make to defendant representations as to the value of the property and what it could be sold for and rented for, and for the purpose of inducing defendant to accept and rely upon such representations as statements of fact, and that plaintiff intentionally misled defendant as to the cost of making repairs, we think is proved. There can be no doubt that defendant relied upon, as facts, what plaintiff told her, and that plaintiff so knew at the time. Though an intention to defraud is not necessary, to defeat the plaintiff in her claim to specific performance (*Smith*

*v. Bricker*, 86 Iowa 285; *Gray v. Bricker*, 182 Iowa 816; *Gray v. La Plant*, 183 Iowa 844), nevertheless, we are of the opinion that such intention existed, and that fraud has been proved. *Hetland v. Bilstad*, 140 Iowa 411; *Aldrich v. Worley*, 200 Iowa 1009; *Owens v. Norwood-White Coal Co.*, 188 Iowa 1092; *Dimond v. Peace River L. & D. Co.*, 182 Iowa 400; 12 Ruling Case Law 249 *et seq.*; 2 Pomeroy's Equity Jurisprudence, Section 878; 26 Corpus Juris 1085 *et seq.*

Specific performance was properly denied, and rescission properly decreed.—*Affirmed.*

STEVENS, C. J., and EVANS, DE GRAFF, ALBERT, and WAGNER, JJ., concur.